STATE OF MAINE  SUPERIOR COURT
CUMBERLAND, ss                    CIVIL ACTION
                                  DOCKET NO. AP-09-11

MOORE, INC.,
        Plaintiff

                                  ORDER ON DEFENDANTS'
v.                                MOTIONS TO DISMISS

CITY OF WESTBROOK, ET AL.,
        Defendants

## BEFORE THE COURT

Defendants bring two motions before the court pursuant to M.R. Civ. P. 12(b)(6): (1) a Motion to Dismiss all claims against Defendants Rielly, O'Hara, Aube, and Gattine, and (2) a Motion to Dismiss all of Plaintiff's Civil Rights Claims.

## PROCEDURAL HISTORY

All claims originate from the City of Westbrook's April 6, 2009 and May 4, 2009 denials of Moore Inc.'s (hereinafter Moore) victualers, pool, and pinball/video machine licenses for "The Skybox" tavern. Following the April 6th denial, Moore filed a four count Complaint, asserting three claims under 42 U.S.C. § 1983 and a Rule 80B Appeal. Moore also filed a Motion for a Temporary Restraining Order (TRO) pursuant to M.R. Civ. P. 65. On April 27th the court entered an order by agreement of the parties, that "'The Skybox' may continue to operate until a license is issued or the motion for TRO is denied, whichever occurs first." The court remanded the 80B Appeal to the Westbrook Board of Municipal Officers to allow reconsideration of the April 6th permit denial. On May 4, 2009, the Board of Municipal Officers voted 4-4, again denying Moore Inc.

1

the licenses for "The Skybox." On both April 6th and May 4th City Council members Rielly, O'Hara, Aube, and Gattine voted against granting the licenses.

On May 8, 2009, Moore filed its First Amended Complaint, which consisted of four counts. Three counts were filed under 42 U.S.C. § 1983[1] alleging: (1) that Westbrook Code Enforcement Officer acted in a manner seeking to impede, deter, or frustrate Moore's constitutional right to lawfully use its property, (2) a violation of Moore's procedural and substantive due process rights due to the bias of four members of the Board of Municipal Officers, and (3) a challenge to Westbrook Ordinance § 20-9 as unconstitutional on its face and as applied. Under the fourth count, Moore filed a Rule 80B appeal, alleging that the May 4th decision is arbitrary and capricious, legally erroneous, and unsupported by substantial evidence. Moore again filed a separate Motion for a TRO pursuant to Rule 65(a).

On June 16th Defendants filed (1) a Motion to Dismiss all claims against Defendants Rielly, O'Hara, Aube, and Gattine, and (2) a Motion to Dismiss all of Moore's Civil Rights Claims. This order addresses Defendants' June 16th Motion.

## FACTUAL BACKGROUND

The Plaintiff, Moore, Inc. challenges the City of Westbrook's denial of licenses needed to operate its bar, "The Skybox," located at 212 Brown Street in

---

[1] 42 U.S.C. § 1983 provides a civil cause of action for the deprivation of rights. It provides:

> Every person who, under color of [law] subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any such action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

2

Moore finally re-opened The Skybox at the end of March 2009. Moore reapplied for the victualers, pool, and pinball licenses because they were set to expire on the annual expiration date of April 30th. Moore claims that the city clerk usually approves license applications for victualers, pool, and pinball machines, unless a city council member requests that the application go before the Board of Municipal Officers. City Council President Rielly requested that Moore's license applications go before the Board.

On April 6th the Board of Municipal Officers met. The City Solicitor was asked whether the denial of Moore's application to renew its victualers license would force The Skybox to close under state liquor license rules. The City Solicitor answered that it would. Later, Municipal Officers Rielly, O'Hara, Aube, and Gattine all voted to deny Moore's licenses. Again, Rielly, O'Hara, Aube, and Gattine each stated on the record that they opposed the existence of a bar at 212 Brown Street. Moore claims that the four municipal officers had fixed minds and were not able to decide the issue in an unbiased manner. The decision to deny the licenses was based in part on an unsubstantiated telephone complaint to the police made on April 4th. The phone complaint asserted that two unruly people in the vicinity of The Skybox were making obscene statements. Additionally, the Board relied on the 20–year history of problems with the bar, previously held by the State to be an insufficient reason to deny the liquor license.

Moore asserts that the actions of the municipal officers were intended to close The Skybox; were calculated to circumvent the State Bureau of Liquor Enforcement's grant of a liquor license; and aimed to deprive Moore of its right to operate a bar at 212 Brown Street. Without its victualers license Moore would have been forced to close its bar before the next Board hearing, which was

scheduled for May 4th. This court entered an order by agreement of the parties to allow The Skybox to remain open until the court decided Moore's Motion for a TRO.

At the May 4th Board hearing, the Board reconsidered Moore's permit applications. Despite requests for their recusal due to their alleged bias, the Defendant municipal officers once again voted 4–4 against granting Moore's licenses. At the May 4th hearing, testimony was provided by Misty Munster, the person who had made the April 4th phone complaint to the police. Munster had also testified against reopening The Skybox at the Zoning Board of Appeals hearing earlier in the year. Moore's attorney attempted to discredit Munster's testimony. She admitted that she had only assumed the noise on April 4th was from patrons leaving The Skybox, and that she did not actually see people leave from the bar. Her testimony ultimately only showed that she heard loud and obscene yelling in the vicinity of The Skybox at some time after the bar had closed. The four Defendant municipal officers found Munster's testimony about her nuisance complaint credible and the single incident sufficient to deny Moore's license applications. The Board of Municipal Officers found that the bar would not meet the requirements of City Ordinance § 20–9(e) or (f), and denied the licenses on the ground that the bar would adversely affect the peace and quiet of the neighborhood.

## DISCUSSION

### I. Standard of Review

A Motion to Dismiss pursuant to M.R. Civ. P. 12(b)(6) "tests the legal sufficiency of the complaint and, on such a challenge, 'the material allegations of the complaint must be taken as admitted.'" *Shaw v. Southern Aroostook Comm.*

6

*Sch. Dist.*, 683 A.2d 502, 503 (Me. 1996) (quoting *McAfee v. Cole*, 637 A.2d 463, 465 (Me.1994)). When reviewing a Motion to Dismiss, this Court examines "the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* A dismissal under M.R. Civ. P. 12(b)(6) will be granted only "when it appears beyond a doubt that the plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim." *Id.* (quoting *Hall v. Bd. of Envtl. Prot.*, 498 A.2d 260, 266 (Me. 1985)). This is a question of law. *Bean v. Cummings*, 2008 ME 18, ¶ 7, 939 A.2d 676, 679.

## II. Moore's Constitutional Claims

### a. Claims Against Municipal Officers Rielly, O'Hara, Aube, and Gattine

Moore sued the Defendant municipal officers in their official capacities. In doing so, Moore seeks declaratory and injunctive relief to prevent the Defendant municipal officers from making future decisions on Moore's licenses. Relying on *Andrews v. Dep't of Envtl. Prot.*, a case that deals with qualified immunity, Moore asserts that absolute immunity only extends to damages, and does not apply to injunctive relief. 1998 ME 198, 716 A.2d 212. *Andrews* stands for the proposition that "state officials sued in their official capacities are 'persons' pursuant to section 1983 only if sued for injunctive relief, not for money damages." *Andrews*, at ¶ 11 n. 4, 716 A.2d at 217 n.4. *Andrews* states that "'a defense of qualified immunity is totally immaterial' to a claim for injunctive relief." *Id.* at ¶¶ 19–20, 716 A.2d at 219. As *Andrews* explains: "Official capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent . . . . [A] plaintiff seeking to recover on a

7

damages judgment in an official capacity suit must look to the government entity itself." *Id.*

Despite Moore's contention, injunctive relief based on § 1983 is not available in this case. As 42 U.S.C. § 1983 states, "injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983 (2006). In this case, a declaratory decree was not violated, and declaratory relief was available. The court has yet to rule on Moore's application for a TRO pursuant to Rule 65(a). Based on the unambiguous language of § 1983, Moore's Civil Rights Act claim against the Defendant municipal officers is premature.

In this case neither party disputes that the four Defendant municipal officers acted in a quasi-judicial capacity when acting on Moore's licenses. As the Law Court stated in *Richards v. Ellis*, a case similar to this one, "[M]embers of a municipal licensing board are immune from civil liability for quasi-judicial decisions within the scope of their authority without regard for bad faith, malice, or other evil motives." 23 A.2d 37, 37 (Me. 1967). The *Richards* court declared that the absolute immunity of a judge covers members of a licensing board. *Richards*, 233 A.2d at 39. "[O]fficials performing judicial functions are afforded absolute immunity," and "if absolute immunity attaches, it applies however erroneous the act or injurious its consequences." *Marr v. Me. Dep't of Human Servs.*, 215 F.Supp. 2d. 261, 267 (D. Me. 2002). The claims against the four Defendant municipal officers are dismissed with respect to the § 1983 claims because they are entitled to absolute immunity.

8

### b. CEO Gouzie

Moore alleges that when CEO Gouzie denied Moore a certificate of occupancy Gouzie was "seeking to impede, deter, or frustrate Moore's efforts to re-open the Skybox." Moore claims that Gouzie's actions were arbitrary and capricious and were intended to deprive or delay Moore in the use of its property in violation of the Fifth and Fourteenth Amendments.

The City of Westbrook seeks to dismiss Moore's claim against Gouzie, alleging that Gouzie is entitled to qualified immunity. Qualified immunity shields government officials from "lawsuits and liability for their discretionary actions." *Munjoy Sporting & Ath. Club v. Dow*, 2000 ME 141, ¶ 18, 755 A.2d 531, 540. A public official can claim qualified immunity when it can be established "that given the state of the law a reasonable official would not have understood that he [was violating the plaintiff's rights.]" *Id*. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 347 (1986).

Moore's Complaint states that Gouzie was "seeking to impede, deter, or frustrate Moore's efforts to re-open the Skybox." In other words, Moore asserts that Gouzie was knowingly violating the law through his conduct. At this juncture, the court cannot determine that Gouzie is entitled to the protections of qualified immunity. Accordingly, the City of Westbrook's Motion to Dismiss the claims against Gouzie is denied.

### c. Moore's Procedural and Substantive Due Process Rights

Moore claims that the denial of its applications for its licenses violated its procedural and substantive due process rights, and that the City's actions were

9

arbitrary and capricious.[5] Moore also appears to assert that because it has a property interest in its liquor license from the state, it has a property interest in the victualers license as well.[6] Moore claims that Westbrook's municipal officers aimed to circumvent Moore's right to use its state liquor license by denying Moore's victualers license.

The City of Westbrook claims that Moore's procedural and substantive due process claims should fail because Moore does not have a property right in any of the licenses it seeks. In order to establish a procedural or substantive due process claim, a party must establish a property interest. *Macone v. Town of Wakefield*, 277 F.3d 1, 9 (1st Cir. 2002) citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972). A license by definition is a revocable grant of permission to commit an otherwise unlawful act. *Black's Law Dictionary* 428 (3rd pocket ed. 2006). "Generally, licenses do not create a protected property interest when broad discretion is vested in a state official or agency to deny or approve the application. In such cases, an applicant has little more than an abstract or unilateral expectation in that license." *Munjoy*, at ¶ 11, 755 A.2d at 537; *See also Gonzales v. Comm'r, Dep't of Pub. Safety*, 665 A.2d 681, 683 (Me. 1995) ("An applicant for a permit does not have a property interest in that permit if there is

_____

[5] In Moore's memo in Opposition to Defendants Motion to Dismiss, Moore focuses solely on the victualers license, as it is the only license that denied Moore the ability to function as a bar.

[6] The court does not find Moore's bootstrapping claim convincing. A liquor license and victualers license are independent licenses. A person operating a bar needs to have a victualers license in order to serve alcohol pursuant to his liquor license. *See* 30-A M.R.S. § 3811 (stating: "A person may not be a common innkeeper or tavernkeeper without a license."); *see also* 30-A M.R.S. § 3801(4) (defining victualer as "a person who serves food or drink prepared for consumption on the premises by the public."). Moore's property interest in its liquor license does not create a property interest in a victualers license.

broad discretion to withhold the benefit. When the provider has broad discretion, the applicant cannot have a reasonable claim of expectation or entitlement to the permit.").

The City of Westbrook is given discretion to grant or deny a victualers license. 30-A M.R.S. §§ 3811 and 3812. For example, section 3812(3)(A)(2) states: "The board may issues the license under any restrictions and regulations that it considers necessary." Additionally, Westbrook Code § 20-3(c) also grants the Board of Municipal Officers discretion, stating "municipal officers, by a majority vote, may authorize the issues of said license, provided that the applicant and the proposed licensed premises are found to be qualified for the issuance of the license under the provisions of this chapter."[7] While Moore claims that the town clerk generally grants victualers licenses as a matter of course, the law clearly indicates that the board has broad discretion, such that Moore does not have a property interest in the licenses.

In *Chongris v. Bd. of Appeals of the Town of Andover*, 811 F.2d 36 (1st Cir. 1987), the First Circuit considered whether a prospective donut shop owner had a property interest in a victualers license sufficient to challenge the denial of the license on a constitutional due process claim. The First Circuit concluded that at best, the shop owners had a "mere unilateral expectation of receiving" a license, and held that they "possessed no property interest in the conditional common

---

[7] Chapter 20 of the City of Westbrook Code of Ordinances governs a variety of business licenses. Section 20–9 of the Code sets standards by which Chapter 20's business licenses may be denied, suspended, or revoked. Specifically the opening paragraph of § 20–9 states: "The municipal officers, or the city clerk, as may be applicable, in addition to other provisions of this code authorizing such action, may deny, suspend, or revoke a license upon one or more of the [grounds under § 20–9]."

victualler's license such as would entitle them to the prophylaxis of procedural due process relief under 42 U.S.C. § 1983." *Chongris*, 811 F.2d at 44.

The Maine Superior Court also addressed whether a property right exists in victualers license in *City of Old Town v. Dimoulas*, 2001 WL 35980916 (Me. Super. 2001). In *Dimoulas*, the Dimoulases claimed the city violated their due process rights by denying their application for a victualers license. *Id.* The court held that "the Dimoulases had no 'property interest in a Victualer's License within the meaning of § 1983' and, therefore, there could have been no violation of the Dimoulases' civil rights." *Id.* The court finds Moore's claim similar to the claims in *Chongris* and *Dimoulas*, and concludes that Moore does not have a property right in the victualers license.

Moore may have expected to receive a victualers license, but Moore only had an expectancy interest, not a property interest. As a result, Moore's procedural and substantive due process claims under 42 U.S.C. § 1983 fail.

### d. City Ordinance § 20–9

Moore asks the Court to declare Westbrook City Ordinance § 20–9(e) unconstitutional on its face, and to declare that § 20–9(e) and (f) are unconstitutional as applied to Moore's license applications. At the 12(b)(6) stage, it is premature to address whether § 20–9(e) and (f) are unconstitutional as applied. Therefore, the court only addresses whether § 20–9(e) is unconstitutional on its face. City Ordinance § 20–9 states:

> The municipal officers . . . may deny, suspend, or revoke a license upon one or more of the following grounds:
> (e)    The business operations have or will likely be a nuisance to owners of adjoining property or to the public and has been or will be detrimental in any way to the health, safety, and general welfare of the public.

Moore contends that § 20-9 does not provide sufficient guidance to applicants and does not sufficiently limit the discretion of the municipal officers.

A court must assume that an ordinance is constitutional and the burden is on the party attacking the ordinance to prove the ordinance's infirmity. *Gannett Co. v. State Tax Assessors*, 2000 ME 171, ¶10, 959 A.2d 741, 747. In order to prevail on a facial challenge to an ordinance, one "must show that, on its face, the ordinance is arbitrary, capricious, and not rationally related to a legitimate government interest." *York v. Town of Limington*, 2003 WL 22290326 at *8 (D. Me. Oct. 7, 2003). "A municipal ordinance is not unconstitutionally vague where it contains sufficient guidance to allow for effective judicial review and this protects the individual from arbitrary municipal action." *Nugent v. Town of Camden*, 1998 ME 92, ¶11, 710 A.2d, 245, 248. "An ordinance is unconstitutionally vague only when it sets guidelines which would force persons of general intelligence to guess at its meaning." *Britton v. Town of York*, 673 A.2d 1322, 1324 (Me. 1996).

If § 20-9(e) were broken into its component parts, the portion of § 20-9(e) which permits denial of a license based on whether an activity "will be detrimental in any way to the health, safety, and general welfare of the public" could be considered vague because it is similar to the ordinance language the Law Court found inadequate in *Cope v. Town of Brunswick*, 464 A.2d 223 (Me. 1983). However, the City of Westbrook claims that when read as a whole § 20-9(e) is constitutional because that portion of the ordinance should be read in conjunction with the Board's determination that the activity in question creates a nuisance. The City claims that what constitutes a "nuisance" is commonly understood and defined. Moore claims that nuisance, a term not defined in the

13

City's ordinances, does not provide sufficient guidance to make 20–9(e) constitutional on its face, and claims that an undefined nuisance standard only detracts from the ordinance's certainty. The court disagrees with Moore's argument.

The nuisance standard is commonly understood and is defined both at common law and by Maine statute. Black's Law Dictionary defines nuisance as "a condition, activity, or situation that interferes with the use or enjoyment of property." *Black's Law Dictionary* 497 (3rd pocket ed. 2006). Similarly, the Law Court has adopted the Prosser and Keeton common law definition of nuisance, as an "interference with the use and enjoyment of land." *Town of Stonington v. Galilean Gospel Temple*, 1999 ME 2, ¶ 15, 722 A.2d 1269, 1272–73 citing PROSSER AND KEETON ON THE LAW OF TORTS § 87 at 615 (5th ed. 1984). By statute a person may bring a cause of action for damages caused by nuisance when "injured in [his or her] comfort, property or the enjoyment of his estate." 17 M.R.S. § 2701 (2009). Even though nuisance is not defined in the ordinance, a person does not need to guess at its meaning. Given that "nuisance" is a commonly understood standard, the court finds that § 20–9(e) is not unconstitutional on its face. The City of Westbrook's Motion to Dismiss is granted with respect to the facial challenge to § 20–9(e).

## DECISION

The court grants the City of Westbrook's Motions to Dismiss (1) the claims against Municipal Officers Rielly, O'Hara, Aube, and Gattine; (2) Moore's procedural and substantive due process claims pertaining to the victualers license; and (3) Moore's claim that Westbrook City Ordinance § 20–9(e) is

14

unconstitutional on its face. The court does not grant the City's Motions with respect to CEO Gouzie, or the "as-applied" challenges to § 20–9.

## SCHEDULING ORDER

The Court orders a stay of the independent claims pending the resolution of the 80B appeal, except that discovery can continue and the parties may file dispositive motions on the independent claims.

The briefing schedule on the 80B appeal is as follows: The plaintiff's brief is due 40 days after this order. It is the Plaintiff's responsibility to submit the record of the proceedings on or before the date that the Plaintiff's brief is filed. The Defendant's brief is due 30 days after service of the brief by the Plaintiff. The Plaintiff has 14 days after service of the brief by Defendant to file a reply brief.

The 80B appeal will be in order for oral argument 20 days after the due date for the reply brief. The clerk will schedule oral argument for the first appropriate date after the appeal is in order for hearing.

Dated at Portland, Maine this _____8th_____ day of _____October_____, 2009.

Robert E. Crowley
Justice, Superior Court

15

Date Filed __04-22-09__     __CUMBERLAND__     Docket No. __AP-09-11__

County

Action __80B APPEAL__

MOORE, INC.

CITY OF WESTBROOK
RICHARD GOUZIE
BRENDAN REILLY
JOHN O'HARA
DOROTHY AUBE
DREW GATTINE

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| DAVID A. LOURIE, ESQ.<br>189 SPURWINK AVENUE<br>CAPE ELIZABETH, ME 04107-9604 | EDWARD BENJAMIN ESQ.<br>JASON DONOVAN ESQ   (all defendants)<br>PO BOX 4630<br>PORTLAND, ME 04101<br>WILLIAM DALE, ESQ.   (DEFS)<br>PO BOX 4510<br>PORTLAND, ME 04112 |

Date of
Entry

2009

STATE OF MAINE                           SUPERIOR COURT
CUMBERLAND, ss                           CIVIL ACTION
                                         DOCKET NO. AP-09-11
                                         REC - CUM-B,2

MOORE, INC.,
     Plaintiff
                                         ORDER ON MOORE, INC.'S
v.                                       80B APPEAL

CITY OF WESTBROOK, ET AL.,
     Defendants

## BEFORE THE COURT

On April 6, 2009 and May 4, 2009, the Board of Municipal Officers of the City of Westbrook denied Moore, Inc.[1] (hereinafter Moore) the renewal of Moore's victualers, pool, and pinball/video game licenses for "The Skybox," a tavern operated by Moore. Moore appeals the denial of the renewal of those licenses pursuant to Rule 80B of the Maine Rules of Civil Procedure.

Moore claims on appeal: (1) that it was denied its licenses by Municipal Officers who were biased and had fixed minds; (2) that there was no substantial evidence supporting the denial of its licenses; and (3) that the use of the victualer's license to deprive Moore of its rights under the liquor license was contrary to law. Because the evidence in the record supports a finding of bias, the court only addresses Moore's first claim on appeal.

## PROCEDURAL HISTORY

The Skybox is located on Brown Street in the City of Westbrook. Some years before the events giving rise to this appeal, Brown Street was zoned as a residential neighborhood and The Skybox became a lawful non-conforming use. The Skybox was previously operated by Ellen and Thomas Dore. The City of

---

[1] Allen and Lynn Moore own Moore, Inc.

1

Westbrook grants licenses and permits through the Board of Municipal Officers, which consists of the mayor and seven city councilors. At all relevant times, , Dorothy Aube, John O'Hara, Andrew Gattine, and Brendan Rielly were members of the City Council. Rielly was the City Council President. On March 3, 2008, following noise complaints, the Board of Municipal Officers denied the Dores renewal of their state liquor license pursuant to City Ordinance § 20-9.[2] The Dores did not appeal the denial to the State Bureau of Liquor Enforcement pursuant to 28-A M.R.S. § 653.[3] They stopped operating The Skybox and decided instead to concentrate on their catering business.

Moore leased the tavern portion of The Skybox from the Dores, and planned to reopen The Skybox. Moore applied to the City for a State of Maine liquor license, a victualer's license,[4] a pool room license, an amusement permit, and a pinball/video machine license. On August 4, 2008, the Municipal Officers considered Moore's applications. The Mayor and six councilors were present at this meeting. Councilor Gattine was absent. During this meeting Council

---

[2] City Ordinance § 20-9 states:
> The municipal officers, or the city clerk, as may be applicable, in addition to other provisions of this code authorizing such action, may deny, suspend, or revoke a license upon one or more of the following grounds:
> (e) The business operations have or will likely be a nuisance to owners of adjoining property or to the public and has [sic] been or will be detrimental in any way to the health, safety, and general welfare of the public.
> (f) The licensee or clients have or will substantially and adversely affect the peace and quiet of the neighborhood in which the licensed premises is located.

[3] The City of Westbrook has authority to issue liquor licenses pursuant to 28-A M.R.S. § 653. Section 653 allows the board of municipal officers to hold public hearings for the consideration of liquor license applications, and provides the grounds on which the municipal officers may deny an application. Article XVIII of the Westbrook Code provides further guidance on hearings for State Liquor License Applications.

[4] The City of Westbrook is granted licensing authority for victualers' licenses pursuant to 30-A M.R.S. § 3812. Article II of the Westbrook City Code governs licenses for Food Service Establishments.

President Rielly moved to amend the liquor license to have last call at the bar be before 10:00 pm Monday through Saturday, and at 5:00 pm on Sunday. This motion failed, with one councilor in favor, and five opposed. Then the City Council members voted to deny the liquor license application and the amusement permit, with three opposed and three in favor[5] – Councilors Rielly,[6] Aube, and O'Hara voted to deny the application.[7] The City Council voted four to two to grant Moore's victualer's license, pool room license, and pinball/video permit – Councilor Rielly voted in favor of Moore and Councilors Aube and O'Hara voted against Moore.

Moore appealed the denial of the liquor license to the State Bureau of Liquor Enforcement, which overturned the permit denial holding that past noise

---

[5] A three to three vote was deemed a denial. (R. at 13).

[6] As reflected in the record, "Councilor Rielly stated that overall he is pleased with the [Moores]. Spoke that the bar in this neighborhood is a recipe for trouble. The problem is alcohol late in the evening." (R. at 7).

[7] With respect to the liquor license the Municipal Officers made the following findings:

2. The property has a very long and very troubled history with a bar improvement and many, many documented breach of peace incidents zoning violations and history of serving patrons beyond reasonable tolerance for alcohol all leading directly to major public safety and nuisance issues in the immediately adjacent residential neighborhood.

3. By an evenly split panel of the Municipal Officers with a vote of 3 to 3 the Municipal Officers are un-persuaded that the current applicants and the proposed business plan will be able to run the bar without falling victim to having the same nuisance experiences at this facility as the neighborhood has experienced in the past. This negative determination was supported by the comments of the Police Chief.

The Decision by the Municipal Officers is 3-3 so the application is denied. The reasoning for this decision is there is insufficient evidence to persuade the majority of the Municipal Officers that the same trouble that existed at this property in the past can be avoided. For this next application the testimony of the Chief of Police only served to reinforce this. The neighborhood retains much of the same character as it has over the years which have contributed directly to its nuisance issues in the past.

(R. at 13).

3

complaints from the time the bar was under prior management could not be a basis for denial of the license to new management.[8] Moore's opening of The Skybox was delayed by the August 4, 2008 denial, by renovations required by the State,[9] and by the Code Enforcement Officer's (CEO) determination that the erection of the partition wall constituted a "change of use," such that the bar lost its status as a lawful non-conforming use. This Board of Appeals overturned the CEO's determination. Moore re-opened The Skybox at the end of March 2009, but it had to reapply for its victualer's, pool, and pinball licenses because they expired on April 30, 2009. These applications were subject to the City of Westbrook's new licensing ordinance, which was put into effect after Moore's August 2008 applications.

Under the new licensing ordinance, the city clerk was delegated authority to grant license renewals, and license renewal applications would only go on the Municipal Officers' agenda if one of the Officers specifically requested the application be scheduled for public hearing. (R. at 21). The renewals of the Skybox's victualer's, pool, and pinball licenses were put on the public hearing agenda at the request of Councilor Gattine.[10] (R. at 21). At the time of the April 6,

---

[8] The State Bureau of Liquor Enforcement found that the Municipal Officers denied Moore's liquor license based on the same evidence upon which the Municipal Officers denied the license renewal to the Dores when they managed The Skybox. The Bureau held that because The Skybox had not yet opened its doors for business, "[t]here was no evidence of repeated incidents of breaches of the peace caused by patrons of The Skybox." Decision of Dept. of Public Safety Liquor Licensing, December 18, 2008.

[9] The Bureau of Liquor Enforcement conditioned Moore's liquor license on the erection of a partition wall between the Dores' catering operation and Moore's operation of The Skybox.

[10] Moore claims that Council President Rielly requested review of the renewal applications, Compl. at 3, however the record seems to indicate that it was Councilor Gattine.

2009 public hearing The Skybox had only been open for business for about a week.

April 6, 2009 Hearing

At the April 6, 2009 public hearing, upon consideration of Moore's applications, and without discussion, a roll call vote was requested by Councilor O'Hara. The vote was four to four, with Councilors Aube, O'Hara, Gattine, and Rielly voting against approval of Moore's licenses. (R. at 29). The Westbrook City Attorney explained that in order to deny the applications to Moore, the Municipal Officers would need to articulate and adopt reasons for denial. The Municipal Officers received a report from the Westbrook police that there was one telephone call on April 4th about loud people in the vicinity of the Skybox around 11:00 pm. The police captain stated, "There was [a call] on April 4th at 2253 hours for loud people outside. When the officer's [sic] responded, the individuals were gone, so we did not have direct contact with the loud group." (R. at 30). It was apparent that the Municipal Officers were not certain if the loud group was connected to The Skybox.[11] After hearing the police captain's report, Councilor Aube stated on the record:

> I agree with Councilor Foley and that these are good applicants,
> however there have been others before. They've done their best to
> run a nice establishment, but I think that what Capt. Roth said
> brings home the point to me. I live in that neighborhood.
> Somebody comes out of the bar, they're loud, yelling walking
> down the street, they're gone before Police get there, but I'm still
> woken up. . . . I don't think a bar belongs in this neighborhood. I
> know it [sic] been there a long time. I just don't believe it belongs
> and that's why I voted the way I did and will continue to do so.

---

[11] Mayor Chuluda stated: "I know there was a call out in the street. You can have rowdy kids up and down Brown Street just coming out of somebody's house. I'm not certain that that's a legitimate reason. If we know that factually these people came out of the bar, that's another story." (R. at 32).

5

(R. at 30). Later, it was asked whether the denial of Moore's application to renew its victualer's license would force The Skybox to close under the State liquor license rules, and the City Attorney answered that it would. After the Municipal Officers articulated their reasoning, the City Attorney drafted a written decision that was adopted by the Municipal Officers to support the four to four vote denying the approval of Moore's licenses.[12] The Municipal Officers adopted the written decision drafted by the City Attorney. The Municipal Officers who voted against The Skybox at the April 6th meeting were the same Municipal Officers that voted against The Skybox at the August 2008 meeting.

On April 22, 2009, Moore filed suit requesting the court strike the votes of the Municipal Officers opposed to The Skybox, and seeking a temporary restraining order from the court because The Skybox would have had to close after April 30th without its victualer's license. The court entered an order by agreement of the parties to allow The Skybox to remain open until the court decided Moore's Motion for a TRO. Additionally, the Board of Municipal

---

[12] Attorney Dale – This would [be] the proposed written decision of the prevailing 4 dissenters on this decision of the Westbrook Municipal Officers for Skybox Bar & Grill:

Facts:
1. Applications, as above, for renewal licenses for victualers/food service establishment, pool room and pinball/video uses.
2. This property has a very long, over 20 years, and sordid history for nuisance conditions of drunken, rowdy behavior in its immediate area from its patrons.
3. Despite, once again, new ownership, the property has already had another complaint reported by the Police Department from April 4, 2009, after being open only one week, of rowdy behavior that has plagued this neighborhood for years.

Conclusions:
A. Applicant's [sic] have failed to carry their burden of proof that their business will not be a nuisance to abutting owners and will not be detrimental to the health, safety and welfare of the public. See Sec. 20-p(e) of the City of Westbrook Code of Ordinance.

(R. at 35, 43).

Officers agreed to reconsider Moore's license renewals at the May 4, 2009 hearing.

May 4, 2009 Hearing

At the May 4th hearing, the Municipal Officers voted to reconsider their prior decision on the Moore's license applications for the victualer's, pool room license and pinball and video licenses. Councilor Aube was the only Municipal Officer opposed to reconsidering Moore's licenses. Allen and Lynn Moore, the owners of Moore, Inc. were present, as was their attorney. Also present was Misti Munster, the person who made the April 4th noise complaint to the police. The police had identified Munster as the caller and she attended the hearing to testify.

Following the April 6th hearing, Captain Roth of the Westbrook Police contacted Munster and summarized her complaint in an email to the Municipal Officers, which recited:

> Initially, she was disturbed by the two groups of 3-5 individuals who exited the bar and were standing outside the door of the bar being loud. She described this group as hollering and screaming. Her residence affords a clear view and she observed this out her window. This continued for sometime until the groups got into cars and drove off. One vehicle did not turn their headlights on. A short while later, another group of men and women were standing outside the bar yelling profanity. According to the complainant, one woman yelled "I need a fucking daughter" and was answered by a male stating "I'll fuck you and give you a daughter." These people lingered outside the door to the bar for a while and eventually left. The second group prompted her to call us.

(R. at 57, 82). Munster's testimony during the May 4th hearing confirmed the substance of Captain Roth's email.[13] Munster testified that she heard two

---

[13] Munster stated:

separate groups of people one at 12:30 AM and one at 12:45 AM, being very loud and yelling. (R. at 87).[14] She testified that she did not have her window open and she could still hear the people. She said she had a direct sight line from her window to the bar and that her house was approximately 100 feet from the bar. (R. at 87-88). She stated that she has not made reports of other incidents because she does not want to be a nuisance to the police. (R. at 87). Munster testified that the disruptive people on April 4th had come from the bar, or from the vicinity of the bar. (R. at 88).

Upon examination by Moore's attorney David Lourie, Munster admitted that she assumed the loud people had come out of The Skybox. (R. at 89). Attorney Lourie also pointed out that Munster really lives between 350 and 410 feet from the door of The Skybox. (R. at 93). Lynn Moore also submitted a petition in support of The Skybox and read into the record letters from people

---

What happened was, I believe it was Saturday April 4, 2009, around 12:30 at night, a large group of people, maybe 4 or 5, had come out of the establishment very loud and yelling in the street for 5 to 10 minutes, so it was bothersome to me. I looked out my window. I have a direct line of sight to the bar. At that point a few people had gotten into their cars and driven off without their headlights on. At some point they turned them on, but were already driving before turning them on. That stopped and then 5 or 10 minutes later 3 or 4 more people came out and those people were yelling even more and were out there quite some time and were saying terrible things that shouldn't be said at 12:30 at night in a neighborhood, such as "F... U... I want more f..king children and people were offering to help her have more children by f..king her", and things of that nature. I found these things they were yelling very disturbing. I didn't have my windows open, and I could hear these things very clearly. . . . That was the first incident that I really noted and then various weekends here and there have been lots of other noise going on usually around closing time. At 12:45 or so a group of people come out and start, you know, yelling again and making lots of noise.

(R. at 87).

[14] The call was reported by Westbrook police as being made at 2253 hours, or 10:53 PM.

who live next to The Skybox stating that they have never heard anything. (R. at 92).

Attorney Lourie suggested that the four Municipal Officers who repeatedly voted against The Skybox had fixed minds, and reminded the Board that they have a legal duty to be impartial and that they must recuse themselves if they can't be impartial. (R. at 93). Attorney Lourie stated:

> We have a rule of law in this state, in this country; we're bound by the constitution and when you are sitting in a quasi judicial position, you don't get to decide what is good for the community when your administering a license, you have to decide if the license standards are met. All of the license standards here were met. Each of the four people who voted against it declared on previous occasions that they would never support a bar opened at this location. That bespeaks a fixed mind. If you have a fixed mind, you cannot sit in judgment on a license. This is black letter law; you are required to recuse yourself if you can't be impartial. I'm not saying you can't have some pre disposition or have some favoritism, but you can't have a fixed mind. You can't look at other facts and twist it to prove something. This is a constitutional requirement of a fair hearing, it's part of our system of government and the courts are there to enforce it. I hope in the future that those Councilors who cannot be fair minded in their approach to this, cannot vote against this bar being there. Where it's a legal non-conforming use, they have a legal right to be there as much as any other use in the City. You cannot say it's inappropriate in that location, that there are bound to be problems in the future from it. Maybe you're right, but that's not your job. Your job is to write the ordinance and then administer those ordinances.

(R. at 93-94). At least one of the Officers took issue with this statement.

Councilor Aube stated:

> I take issue with what the attorney was saying as far as what we do up here. My thought when I was running for Council that I was elected to represent the people in my ward. If it was merely to interpret law, then that's not why I'm sitting up here. I feel that I'm doing what people want me to do. If they don't like it, they won't elect me the next time.

(R. at 97-98). The City Solicitor affirmed the importance of being fair and open-minded, stating:

9

[F]irst, you absolutely must come to this proceeding, as you do other license application proceedings that are quasi judicial, with an open mind. Attorney Lourie made some comments that if some of you don't think you can participate in this with an open mind, you should recuse yourself. I agree with him completely. If you do not think you can consider the facts as applied to this ordinance standard with an open mind, you ought to recuse yourself and not vote as it is not fair to the applicants; second, there are occasions when the Councilors have very broad discretion with regard to policy matters, such as passing an amendment to an ordinance. There are times, like it or not, when Maine law and Westbrook law require you to sit in a quasi judicial capacity and again make fact findings and apply those to legal approval standards, and this is one of those cases. This is one of those instances, like it or not, you are going to have to make factual determinations, and one of them may be a credibility determination of the one lady who said there was noise and the applicant who said there may not have been, and then apply the factual determinations and credibility determinations to those ordinance standards, particularly the two I referenced earlier.

Like it our not, this is an instance where you're going to have to be somewhat like a judge or Zoning Board Member as opposed to having that broad discretion that you have when making policy judgments in passing ordinances. Here you have to act in the quasi judicial fashion and make fact findings. If the applicants have met the standards, then you should vote yes; if they haven't, then you'd have to vote no.

(R. at 98). Shortly after the City Solicitor made this statement, the Municipal Officers voted against granting Moore's license renewals by a vote of four to four – Councilors Aube, O'Hara, Gattine, and Rielly all voted against granting renewal. (R. at 101). The four who cast the prevailing negative votes found Munster's testimony credible, and relying on the April 4th noise complaint determined that the proposed facility would be a nuisance to the adjoining property owners and would substantially and adversely affect the peace and quiet of the neighborhood. (R. at 112).

## DISCUSSION

### 1. Bias of the Decision Makers

10

Moore claims that the those who voted against Moore's licenses – Councilors Aube, O'Hara, Gattine, and Rielly – had fixed minds and were biased, such that any of them or all of them should have been disqualified from voting on Moore's license renewals. Parties to an administrative or government proceeding are entitled to a fair and unbiased hearing. *Gorham v. Town of Cape Elizabeth*, 625 A.2d 898, 902 (Me. 1993). Rule 80B addresses appeals of government action, including allegations of bias by members of municipal officers in permitting decisions. *Adelman v. Town of Baldwin*, 2000 ME 91, ¶ 7, 750 A.2d 577, 581. "The issue of bias is properly addressed in the Rule 80B appeal because 80B(d) provides a specific mechanism for augmenting the record if necessary to show bias." *Id.* Where a party does not file a motion for a trial on the facts, the court's review is limited to the record. M.R. Civ. P. 80B(f). Moore did not request a trial on the facts; therefore, the Court examines the record to determine if bias affected the Municipal Officers' decisions on Moore's application.

A claim of actual bias must be alleged to have had an actual effect on the fairness of the governmental proceedings. *Baker's Table, Inc. v. City of Portland*, 2000 ME 7, ¶ 9, 743 A.2d 237, 241. A vague allegation of bias is insufficient. *Id.* "The good faith of a public official is not lightly to be denied. Proof of prejudice and bias sufficient to overcome the sense of responsibility to office and to community must be heavy." *Chequinn Corp. v. Mullen*, 159 Me. 375, 381, 193 A.2d 432, 435 (Me. 1963). A preconceived position on law, policy or legislative facts is not a ground for disqualification; the issue is whether any Municipal Officer prejudged the issues in the case in favor of or against one party. *Adelman v. Town of Baldwin*, 1999 Me. Super. LEXIS 328, 4 (Me. Super. Ct., Cum. Cty., Dec. 8, 1999)

11

(Mills, J.) citing *New England Tel. & Tel. Co. v. Public Utilities Comm'n*, 448 A.2d 272, 280 (Me. 1982). In federal cases, agency officers have been disqualified from their adjudicative positions "only after a showing of prejudgment on the specific facts subsequently presented to the agency." *New England Tel. & Tel. Co. v. Public Utilities Comm'n*, 448 A.2d at 280.

A prejudgment of adjudicative facts can be grounds for disqualification of a public official. Richard J. Pierce, Jr., *Administrative Law Treatise*, § 9.8 p. 664 (2002). "[T]o show disqualifying prejudgment, a claimant must demonstrate that the mind of the decisionmaker is 'irrevocably closed" on the particular issues being decided." Stein, Mitchell & Mezines, *Administrative Law*, § 35.03 pp. 42-43 (2007) "If bias is proven, a judgment arising from the prejudicial proceeding will be invalidated." *Id* at § 35.03 p. 33.

Moore argues that the Board impermissibly considered complaints about the bar when it was under prior management in making its decision. The State Bureau of Liquor Enforcement overruled the Board's denial of Moore's liquor license on the grounds that the Municipal Officers impermissibly based their reasoning on the history of the bar when it was under prior management.[15] During the April 6th and May 4th hearings, the comments of the dissenting voters continued to rely on the history of complaints associated with bars at The Skybox's location. Despite Moore's argument, the Court rules that the Municipal Officers are allowed to consider the history of complaints at The Skybox's location. Nothing in the City of Westbrook's license requirements under City

---

[15] It appears the Bureau of Liquor Enforcement interprets the State liquor license requirements as providing new applicants with a clean slate. The Board did not appeal the Bureau's determination.

12

Ord. § 20-9 suggests such considerations are precluded. Additionally, it is unreasonable to expect the Municipal Officers to approach this decision while totally ignoring the history of the operation of a bar on the premises. It is of course, relevant to consider the extent to which the business has been or will be operated in the same way or differently from past operations.

Turning to allegations that individual Municipal Officers were biased, the operative inquiry is whether a Municipal Officer's preconceptions or prejudgments evidence that their minds were closed or fixed, such that they could not fairly evaluate the facts of Moore's application. Based on the evidence in the record, the court concludes that Councilor Aube was biased against Moore's applications. Councilor Aube voted against Moore's liquor license in August 2008, and she voted against granting Moore's victualer's, pool, and pinball/ video game licenses at both the April 6th and May 4th hearings. Councilor Aube's statements during the April 6th (*supra* p. 5) and May 4th (*supra* p. 9) hearings evidence her bias against Moore's applications. The court is especially troubled by Councilor Aube's statements during the May 4th hearing after Attorney Lourie commented on the duty to be impartial. *Supra* p. 9. These statements indicate that Aube prejudged issues of fact before considering Moore's application and that she ignored her duty as a quasi-judicial decisionmaker. Even though the City Attorney made an effort to redirect the Municipal Officers following Aube's statements, Aube did not speak again during this hearing and nothing in the record indicates that Aube retreated from her hard line position. Because of Councilor Aube's evident bias she should not have participated in the vote on Moore's applications.

13

The court does not need to examine the potential bias of the other Municipal Officers or address Moore's other claims to conclude that Moore's appeal should be granted. The parties disagree about what the appropriate remedy is when a municipal board's decision is affected by bias. Moore contends that since the vote denying the license was 4-4, the vote of a biased Municipal Officer should be disqualified and the Moore's application should be approved. The Court has not found legal support for this remedy. Generally, when bias taints a proceeding, no judgment based on the proceeding will be allowed to stand. Stein, Mitchell & Mezines, *Administrative Law*, § 35.03 pp. 33-34. Although the Maine Administrative Procedures Act (APA), 5 M.R.S. §§ 8001–11008, does not speak directly to municipal administrative procedures, the Court looks to the APA for guidance. Under Maine's APA when a decision is affected by bias the decision is vacated and remanded. *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 7, 870 A.2d 566, 569 citing 5 M.R.S. § 11007(4)(C).

## DECISION

Therefore, the entry is:

Moore, Inc.'s Appeal is GRANTED. The City of Westbrook's decision is vacated and remanded for further proceeding consistent with this Order.

Dated at Portland, Maine this __23RD__ day of __March__, 2010.

_____

Robert E. Crowley
Justice, Superior Court

14

Date Filed __04-22-09__     CUMBERLAND     Docket No. __AP-09-11__

County

Action __80B APPEAL__

MOORE, INC.

CITY OF WESTBROOK
RICHARD GOUZIE
BRENDAN REILLY
JOHN O'HARA
DOROTHY AUBE
DREW GATTINE

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| DAVID A. LOURIE, ESQ.<br>189 SPURWINK AVENUE<br>CAPE ELIZABETH, ME 04107-9604 | EDWARD BENJAMIN ESQ.<br>JASON DONOVAN ESQ   (all defendants)<br>PO BOX 4630<br>PORTLAND, ME 04101<br>WILLIAM DALE, ESQ.   (DEFS)<br>PO BOX 4510<br>PORTLAND, ME 04112 |

Date of
Entry

2009